J-S18017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Z.T.-D.N., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: C.B.N., MOTHER | |
| | No. 3108 EDA 2016 |

Appeal from the Order Entered September 13, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000186-2014
CP-51-DP-0012032-2010

| | |
|---|---|
| IN THE INTEREST OF: Z.N.N., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: C.B.N., MOTHER | |
| | No. 3109 EDA 2016 |

Appeal from the Order Entered September 13, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000187-2014
CP-51-DP-0012031-2010

BEFORE: PANELLA, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED APRIL 19, 2017**

Appellant C.B.N. ("Mother") appeals from the September 13, 2016

orders granting petitions filed by the Philadelphia Department of Human

---

[*] Former Justice specially assigned to the Superior Court.

Services ("DHS") for involuntary termination of her parental rights to her children, Z.T.-D.N., born November 2009, and Z.N.N., born October 2008, (collectively, "the Children"). Upon careful review, we affirm.

The trial court set forth the facts of this case as follows:

The family in this case became known to DHS on December 31, 2009, when DHS received a General Protective Services ("GPS") report that Mother was transient, suffered from bipolar disorder, and was breastfeeding [Z.T.-D.N.] while suffering from a serious, untreated infection of [methicillin-resistant Staphylococcus aureus "MRSA"]. This report was substantiated. On January 6, 2010, DHS obtained an Order of Protective Custody ("OPC") and placed the Children in a foster home. The court adjudicated the Children dependent at a January 21, 2010, hearing and fully committed them to DHS custody.

Mother made steady progress in complying with court-ordered objectives, and on June 13, 2011, the court returned the Children to Mother and discharged the case.

On February 27, 2012, DHS received a GPS report alleging that Mother was facing eviction and had refused to enter a shelter with the Children. DHS obtained an OPC and placed the Children in a foster home. The Children were adjudicated dependent on March 7, 2012, and fully committed to DHS custody. The case was transferred to a Community Umbrella Agency ("CUA") which developed a Single Case Plan ("SCP") with objectives for Mother.

At regularly-scheduled permanency hearings between 2012 and 2015, Mother never successfully complied with her SCP objectives. DHS filed a petition to involuntarily terminate Mother's parental rights on April 23, 2014. This petition was amended on August 19, 2016.

Trial Ct. Op., 11/10/16, at 1-2 (some formatting added).

A goal change and termination hearing was held on September 13, 2016. At the hearing, the CUA case manager, Alice Williams, testified that Mother's SCP objectives were to obtain suitable and permanent housing, attend the Clinical Evaluation Unit for a dual diagnosis assessment, attend the Achieving Reunification Center for services, undergo a Parenting Capacity Evaluation, and visit with the Children. Trial Ct. Op. at 2; N.T., 9/13/16, at 16.

Ms. Williams testified that Mother did not currently have appropriate housing for the Children and had lived at five different addresses since 2012, and thirteen different addresses since 2009. Mother had received three housing grants. Mother was offered a chance to enter a shelter, but refused. At the time of the hearing, Mother was living in a family member's house, and did not have a lease for that house. Trial Ct. Op. at 2.

Mother did not consistently attend mental health treatment until June 14, 2016. Ms. Williams testified that she was concerned about Mother's mental health because Mother was dismissive of problems, had mood swings, and cursed at CUA employees. Trial Ct. Op. at 2.

Mother completed a parenting class, but Ms. Williams testified that she believed Mother needed an additional parenting class because Mother had not expressed an interest in how the Children were doing. Mother refused to sign a consent for mental health treatment for one of the Children, and DHS had to obtain a court order. Mother had a Parent Capacity Evaluation in

2013, which recommended that she maintain housing, continue employment, obtain a general equivalency diploma, attend therapy, and participate in visits. Although Mother obtained a diploma and continued employment, she failed to comply with the other recommendations. Mother was referred for a second Parent Capacity Evaluation, and, after rescheduling several times, had an appointment scheduled for October 2016, after the court's hearing on DHS's petition for a goal change and termination of Mother's parental rights. Trial Ct. Op. at 2-3; N.T., 9/13/16, at 22-28, 44-46, 74-76.

Ms. Williams testified that Mother usually attended visits, but had not seen the Children for at least one month by the time of the September 13, 2016 hearing. Z.T.-D.N. told Ms. Williams he did not want to see Mother, and the Children threw tantrums when it was time for Mother to visit. Trial Ct. Op. at 3. The Children were in pre-adoptive homes, and Ms. Williams testified that it was in their best interest to terminate Mother's parental rights. Trial Ct. Op. at 3; N.T., 9/13/16, at 29, 48-50.

Dawn Scott, the CUA reunification coach who supervised Mother's visits with the Children, testified that Mother had not been consistent with visits in the last six months. Visits were moved from Mother's house to DHS after Mother yelled at a foster parent during a visit. Mother was offered twenty-two visits at DHS. She attended six. Mother brought the Children's sibling, a baby, to visits, and focused on the baby rather than the Children.

At one visit, Mother brought food for the baby, and when the Children said they were hungry and asked for some, she fed it all to the baby. During visits, Mother is not open to feedback or redirection. Z.T.-D.N. did not want to visit Mother; had to be carried, kicking and screaming, to the visits; and did not want to interact with Mother during the visits. Z.N.N. refused to attend one visit. Ms. Scott described Mother's relationship with Z.N.N. (who was seven years old at the time of the hearing) as more of a "girlfriend relationship" than a parent-child relationship. Ms. Scott testified that Mother is unable to provide for the Children, and it is in the Children's best interest to be adopted. Trial Ct. Op. at 3-4; N.T., 9/13/16, at 93-102, 104-09, 115-20.

Mother presented testimony from Melissa Watts, a previous CUA supervisor. Ms. Watts stated that when she had the case, between December 11, 2015 and March 30, 2016, she believed reunification was a viable option. At that time, she also believed that termination of Mother's rights would not be in the Children's best interest, and would cause the Children irreparable harm. However, Ms. Watts never supervised any visits between Mother and the Children and never spoke to the Children about Mother. When Ms. Watts was the case supervisor, Mother was renting a room in a shared living facility, and did not have room for the Children there. Trial Ct. Op. at 4; N.T., 9/13/16, at 139-50.

Mother testified, accurately identifying her SCP objectives and stating that she completed them prior to her reunification with the Children in 2011. Mother claimed that she did not understand her objectives when the Children came back into care in 2012. Mother had attended almost every court hearing. Mother said that she missed visits with the Children because the reunification coach did not show up, and she had difficulty attending therapy because it conflicted with her work schedule. Mother began therapy in June of 2016. She signed releases for CUA to obtain her mental health records. She denied ever having any mental health diagnosis, despite documentation showing that she had been diagnosed with Major Depressive Disorder. Although Mother attended two parenting classes, she was unable to explain what she had learned. Mother had two jobs and was trying to save money, but could not afford a deposit for appropriate housing. Mother admitted that she refused to sign consents when Z.T.-D.N. was hospitalized in 2016. She did not know the name of the Children's therapists. Trial Ct. Op. at 4-5; N.T., 9/13/16, at 151-52, 157, 159-60, 164, 165-67, 171-72, 174, 180, 183-84, 191-93, 197-98.

At the conclusion of the hearing, the trial court granted the petitions to terminate Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (8)[1] and (b), and changed the Children's goals to adoption.

---

[1] The trial court also found that termination was appropriate under 23 Pa.C.S. § 2511(a)(5). ***See*** N.T., 9/13/16, at 228; Decree of Involuntary
*(Footnote Continued Next Page)*

Trial Ct. Op. at 5.[2]  On September 26, 2016, Mother filed timely notices of appeal.  This Court consolidated the appeals *sua sponte.*

On appeal, Mother presents the following issues for our review:

> A. Whether the trial court committed reversible error when it involuntarily terminated mother's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act[,] 23 Pa. C.S.A. § 2511 (a)(1), (a)(2), (a)(5), and (a)(8)[,] as mother made progress towards working and meeting her FSP[3] goals, namely staying drug free, working towards obtaining housing, working on parenting skills, and other goals, during the child's placement?
>
> B. Whether the trial court committed reversible error when it involuntarily terminated mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental[,] physical and emotional needs of the child as required by the Adoption Act[,] 23 Pa. C.S.A. § 2511(b)?

_(Footnote Continued)_  _____

Termination of Parental Rights, 9/13/16.  However, the trial court does not mention Subsection (a)(5) in its opinion.  Because we affirm on the basis of the trial court's decision with regard to Subsections (a)(1), (2), and (8) and Subsection (b), we need not address Subsection (a)(5).  ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super.) (*en banc*) (holding that in order to affirm, Superior Court need only agree with trial court as to any one subsection of Section 2511(a) and as to Section 2511(b)), ***appeal denied***, 863 A.2d 1141 (Pa. 2004).

[2] The trial court also terminated the parental rights of the Children's fathers, who did not appeal.  ***See*** Trial Ct. Op. at 5 n.1.

[3] Mother does not define "FSP," but this acronym is often used for Family Service Plan.  ***See, e.g.***, ***In re N.A.M.***, 33 A.3d 95, 97 (Pa. Super. 2011). The goals Mother identifies in her brief are consistent with her SCP objectives.

Mother's Brief at 4. Mother challenges only the termination of her parental rights; she does not challenge the change of the permanency goal to adoption.

We consider Mother's issues in light of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the

emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are satisfied. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Section 2511 of the Adoption Act provides:

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (8), and (b).

Mother argues that the trial court failed to recognize the progress she had made toward meeting the goals DHS set for her. She also contends that the trial court failed to consider her bond with the Children and the effect that termination of her parental rights would have on the needs and welfare of the Children.

After careful review of the record, the parties' briefs, and the trial court's decision, we affirm on the basis of the trial court opinion by the Honorable Joseph Fernandes. *See* Trial Ct. Op. at 5-13 (holding (1) clear and convincing evidence existed to terminate Mother's parental rights under subsections (a)(1), (2) and (8); and (2) court properly determined that termination of Mother's parental rights would be in the best interest of the Children). Because we discern no abuse of discretion or error of law, we affirm the orders below. *See In re T.S.M.*, 71 A.3d at 267. The parties are instructed to include the attached trial court decision in any filings referencing this Court's decision.

- 10 -

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Prothonotary


Date: <u>4/19/2017</u>

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of Z.T.-D.N., a Minor | : | CP-51-DP-0012032-2010 |
| | : | CP-51-AP-0000186-2014 |
| In the Interest of Z.N.N., a Minor | : | CP-51-DP-0012031-2010 |
| | : | CP-51-AP-0000187-2014 |
| | : | |
| | : | FID: 51-FN-471113-2009 |
| | : | |
| APPEAL OF: C.N., Mother | : | 3108/3109 EDA 2016 |

**OPINION**

**Fernandes, J.:**

Appellant C.N. ("Mother") appeals from the order entered on September 13, 2016, granting the petition filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate Mother's parental rights to Z.T.-D.N. ("Child 1") and Z.N.N. ("Child 2") ("Children") pursuant to the Adoption Act, 23 Pa.C.S.A. §2511(a)(1), (2), (8) and (b). Aaron Mixon, Esq., counsel for Mother, filed a timely Notice of Appeal with Statement of Matters Complained of on Appeal pursuant to Rule 1925(b).

**Factual and Procedural Background:**

The family in this case became known to DHS on December 31, 2009, when DHS received a General Protective Services ("GPS") report that Mother was transient, suffered from bipolar disorder, and was breastfeeding Child 1 while suffering from a serious, untreated infection of MRSA. This report was substantiated. On January 6, 2010, DHS obtained an Order of Protective Custody ("OPC") and placed the Children in a foster home. The court adjudicated the Children dependent at a January 21, 2010, hearing and fully committed them to DHS custody. Mother made steady progress in complying with court-ordered objectives, and on June 13, 2011, the court returned the Children to Mother and discharged the case. On February 27, 2012, DHS received a GPS report alleging that Mother was facing eviction and had refused to enter a shelter with the Children. DHS obtained an OPC and placed the Children in a foster home. The Children were adjudicated dependent on March 7, 2012, and fully committed to DHS custody. The case was

transferred to a Community Umbrella Agency ("CUA") which developed a Single Case Plan ("SCP") with objectives for Mother. At regularly-scheduled permanency hearings between 2012 and 2015, Mother never successfully complied with her SCP objectives. DHS filed a petition to involuntarily terminate Mother's parental rights on April 23, 2014. This petition was amended on August 19, 2016.

The goal change and termination trial was held on September 13, 2016. At the trial, the CUA case manager testified that the Children had come into care around 2010 because Mother was transient and breastfeeding while infected with MRSA. The Children had been reunified with her in 2011, but came back into care in 2012 because Mother was about to be evicted. (N.T. 9/13/16, pgs. 11-12, 14). Mother's SCP objectives were to obtain stable housing, attend the Clinical Evaluation Unit ("CEU") for dual diagnosis assessment, attend the Achieving Reunification Center ("ARC") for services, take a Parenting Capacity Evaluation ("PCE") and visit with the Children. (N.T. 9/13/16, pg. 16). Mother did not have appropriate housing, and had lived at five different addresses since 2012, and thirteen different addresses since 2009. Mother was offered a chance to enter a shelter with the Children, but she refused. (N.T. 9/13/16, pgs. 16, 41). Mother had received three PHMC housing grants, which the CUA case manager testified was unusual, since these grants were intended to be a one-time payment to permit a family to make a deposit on a lease. These grants were each between $1,500 and $2,500. Mother was arrested and imprisoned for several months, losing her housing. The criminal charges were dropped. (N.T. 9/13/16, pgs. 17, 41-42). Mother currently works two jobs and lives in a house owned by a family member. She does not have a lease for that house. (N.T. 9/13/16, pg. 18). Mother has admitted to CUA in the past that she had been diagnosed with mood disorders and bipolar disorder. (N.T. 9/13/16, pg. 68). Mother has both admitted to being prescribed medications for mental health, and also denied being on medication. (N.T. 9/13/16, pgs. 85-87). CUA re-referred Mother for mental health evaluation and services on January 25, 2016, but never received any records showing that Mother was evaluated or began treatment. (N.T. 9/13/16, pg. 21). Mother only engaged in consistent mental health treatment since June 14, 2016, and could not provide documents showing that she had attended before that date. (N.T. 9/13/16, pg. 19). The CUA case manager testified that she has concerns about Mother's mental health, since Mother is dismissive of problems, has mood swings and often curses at CUA employees. (N.T. 9/13/16, pgs. 43-44, 83-84). Mother was referred for a parenting

class at ARC, which she completed. However, the CUA case manager testified that due to Mother's behavior, Mother would need to complete the parenting class again. Mother never asks about the Children during her interactions with CUA. (N.T. 9/13/16, pgs. 22-23). Mother never signed consents to permit the Children to receive therapy at Joseph J. Peters Institute ("JJPI"), and DHS was forced to obtain a court order authorizing the treatment. (N.T. 9/13/16, pgs. 24-25, 27-28). The Children had previously been attending JJPI regularly while in Mother's care. It was only after their removal that attendance became an issue. (N.T. 9/13/16, pg. 62). Mother's refusal to sign consents for the Children impaired their health and emotional well-being. (N.T. 9/13/16, pgs. 47-48). Mother described to the CUA case manager how a friend would "provide support" for the Children if they were reunified with Mother. (N.T. 9/13/16, pg. 26). Mother completed a PCE in 2013. This PCE recommended that Mother obtain her GED, find more permanent employment and engage in individual therapy. (N.T. 9/13/16, pgs. 45-46). Mother successfully obtained her GED. (N.T. 9/13/16, pg. 75). Mother was referred for a second PCE in March 2016, but due to her missing the appointment, this was rescheduled several times. The most recent appointment is scheduled for October 21, 2016. (N.T. 9/13/16, pgs. 27-28, 90). The Children are placed in pre-adoptive homes, and it is in their best interest to be adopted. (N.T. 9/13/16, pgs. 29, 50). The CUA case manager testified that Mother usually attended visits, but had not seen the Children in a month at the time of the trial. (N.T. 9/13/16, pg. 30). Child 1 does not want to see Mother, saying that Mother is "not my Mom". (N.T. 9/13/16, pg. 49). The Children throw tantrums and become violent when visits with Mother are mentioned. (N.T. 9/13/16, pgs. 80-81). The Children would not suffer any irreparable harm if Mother's rights were terminated. (N.T. 9/13/16, pgs. 47-48). The CUA visitation coach testified that Mother's visitation with the Children is inconsistent. (N.T. 9/13/16, pg. 94). Visits had been at Mother's home, but during one visit Mother yelled at the foster parent and caused an incident. (N.T. 9/13/16, pg. 106). Visits were moved to DHS. Since the visits were moved, Mother was offered twenty-two visits. Mother made six visits, missed thirteen and had scheduling conflicts for three. (N.T. 9/13/16, pgs. 95-96, 107). At one visit, the Children were hungry. Mother brought the Children's sibling, a baby who is not in DHS care, to the visit. Mother also brought food, and when the Children asked for it, Mother fed the food to the baby instead. The Children got none. (N.T. 9/13/16, pg. 97). Mother spends most of her time during visits holding and interacting with the baby, which is not in DHS care. (N.T. 9/13/16, pgs. 119-120). Child 1 kicks and screams when visits are about to begin, and must

be physically picked up and carried into the room. Child 2 dreads visits, and once simply refused to attend. (N.T. 9/13/16, pgs. 98-99). Mother is not open to advice or redirection during visits, and is not able to provide for the Children at this time. The CUA visitation coach testified that it was in the Children's best interest to be adopted. (N.T. 9/13/16, pgs. 101-102). Child 1 does not want to interact with Mother during visits. (N.T. 9/13/16, pg. 116). Mother's relationship with Child 2 is a girlfriend-type relationship, and is not parental. Mother speaks to Child 2, who is seven years old, as though Child 2 was Mother's teenage girlfriend. This behavior is not age-appropriate for either Mother or Child 2. (N.T. 9/13/16, pgs. 108, 117-118). The former CUA supervisor testified that when she had the case, between December 11, 2015 and March 30, 2016, reunification with Mother was viable. The former CUA supervisor opined that, during that time, the Children would suffer irreparable harm if Mother's rights were terminated. However, the former CUA supervisor never spoke with the Children and never observed any visit with Mother. (N.T. 9/13/16, pgs. 139-145). Mother never lived in housing with room for herself, the baby and the Children. Mother was renting a room. (N.T. 9/13/16, pgs. 149-150).

Mother testified, accurately reciting her SCP objectives. The Children had been reunified with Mother in 2012. (N.T. 9/13/16, pg. 159). Mother also testified that she attended all prior hearings because she wanted to reunify with her Children, but never understood what her goals were at the time the Children came back into care a second time. (N.T. 9/13/16, pgs. 191-192). Mother testified that she missed scheduled visits because the CUA visitation coach did not show up. (N.T. 9/13/16, pgs. 151-152). Mother testified that she did not do mental health intakes because they conflicted with her work schedule. (N.T. 9/13/16, pg. 180). Mother testified that she had engaged with mental health treatment three months ago, and that this was her first ever engagement with treatment. Mother has signed the appropriate releases. (N.T. 9/13/16, pg. 157). Mother testified that she had attended substantially more than five sessions, then read from a treatment record which established that she attended only five sessions. (N.T. 9/13/16, pgs. 194-195). Mother testified that she had never had a mental health diagnosis, had never been on medication and had no history of mental illness. (N.T. 9/13/16, pg. 164). Mother also read from a document which stated that she had been diagnosed with Major Depressive Disorder. (N.T. 9/13/16, pg. 193). Mother testified that she had completed two parenting courses, but was still court-ordered to complete a third course. (N.T. 9/13/16, pgs. 166-167). Mother was completely unable to explain anything she had

learned at parenting classes, stating "I don't want to say I didn't learn anything." (N.T. 9/13/16, pgs. 183-184). Mother testified that she worked two jobs, but did not have appropriate housing because she could not save up enough for a deposit. (N.T. 9/13/16, pg. 172). Mother had received $2,500 in one of her PHMC grants for housing assistance, but subsequently lost the property. Mother's has a long history of unstable housing. Even with PHMC grant assistance, Mother is unable to maintain stable housing. (N.T. 9/13/16, pgs. 174-176, 177-179). Mother testified that she refused to sign consents for Child 1's treatment during his 2016 hospitalization, and did not know the name of Child 2's trauma therapist, though she had previously been ordered to attend the Children's medical appointments. (N.T. 9/13/16, pgs. 196-198). Following argument, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (8) and (b) and changed the Children's goals to adoption.[1] On September 26, 2016, Mother filed this appeal.

**Discussion:**

Mother avers on appeal that the trial court committed reversible error when it:

1. Involuntarily terminated Mother's parental rights such determination was not supported by clear and convincing evidence under the Adoption Act 23 Pa.C.S.A. §2511(a)(1), (2) and (8) when [Mother] made progress towards working and meeting the ESP [*sic*] goals.

2. Involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental physical and emotional needs of the Children as required by the Adoption Act 23 Pa.C.S.A. §2511(b).

Mother has not appealed the trial court's change of permanency goal to adoption, therefore she has waived the issue on appeal. Mother has appealed the involuntary termination of her parental rights. The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a), which provides the following grounds for §2511(a)(1):

**(a) General rule** - The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:

(1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

---

[1] The trial court also terminated the parental rights of the Children's fathers and putative fathers. None of these individuals has appealed.

In proceedings to involuntarily terminate parental rights the burden of proof is on the party seeking termination, which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994). To satisfy section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. However, the six-month time period should not be applied mechanically; instead, the court must consider the whole history of the case. *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). The standard of clear and convincing evidence is defined as testimony that is so clear, direct weighty and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue.

The amended petition for involuntary termination was filed on August 19, 2016. Mother's SCP objectives were to obtain stable housing, attend CEU for dual diagnosis assessment, attend the ARC for parenting classes, take a PCE and comply with the recommendations and visit with the Children. (N.T. 9/13/16, pg. 16). Mother does not have appropriate housing, and has lived at five different addresses since the Children came into care. At the start of this case in 2012, Mother was offered housing at a shelter with the Children, but she refused and the Children had to be taken into care. (N.T. 9/13/16, pgs. 16, 41). Mother currently lives in a house owned by a family member, but does not have a lease for that house. (N.T. 9/13/16, pg. 18). Mother lives with her baby, who is not in care. Mother has never had appropriate housing for herself, the baby and the Children. (N.T. 9/13/16, pgs. 149-150). Mother testified that she worked two jobs, but was unable to save enough money for a deposit on an appropriate house. (N.T. 9/13/16, pg. 172). Mother received three PHMC housing grants, each of which was over a thousand dollars. These grants are not intended to be given repeatedly, but are one-time payments to cover a deposit and first month's rent. (N.T. 9/13/16, pgs. 17, 41-42, 174-176, 177-179). Mother never attended CEU for dual diagnosis assessment, and is not engaged in drug and alcohol treatment. Mother testified that she had never had a mental health diagnosis, had never been on medication and had no history of mental illness. (N.T. 9/13/16, pg. 164). In the past, Mother has both admitted and denied mental health diagnoses and the use of prescription medications. (N.T. 9/13/16, pgs. 68, 85-87). CUA referred Mother for mental health evaluation and services on January 25, 2016, but never received

any records showing that Mother was evaluated or began treatment. (N.T. 9/13/16, pg. 21). Mother testified that she did not do mental health intakes because they conflicted with her work schedule. (N.T. 9/13/16, pg. 180). Mother first engaged consistently in mental health treatment on June 14, 2016, and has not provided any documentation of her treatment. In the three months she has been engaged, Mother attended five sessions. (N.T. 9/13/16, pgs. 19, 157, 194-195). Mother has Major Depressive Disorder. (N.T. 9/13/16, pg. 193). The CUA case manager testified that Mother's mental health is still a concern, because Mother has mood swings and often curses at CUA employees. (N.T. 9/13/16, pgs. 43-44, 83-84). Mother completed two parenting classes at ARC, but the CUA case manager testified that Mother's behavior indicated that Mother would need to complete the class a third time. (N.T. 9/13/16, pgs. 22-23, 166-167). Mother was completely unable to explain anything she had learned at parenting classes, stating "I don't want to say I didn't learn anything." (N.T. 9/13/16, pgs. 183-184). Mother completed a PCE in 2013, which recommended that Mother engage in individual therapy. Mother did not engage until June 2016. The PCE stated that Mother was not ready to parent full-time. (N.T. 9/13/16, pg. 45-46). Because so much time had passed, Mother was referred for a second PCE in early 2016. This appointment was rescheduled several times due to Mother missing appointments. The most recent appointment is scheduled for October 21, 2016. (N.T. 9/13/16, pgs. 27-28, 90). Mother originally had supervised visitation in her own home, but during one visit she had a verbal altercation with the foster parent. Visits were then moved to DHS. (N.T. 9/13/16, pg. 106). Since the visits were moved, Mother has made six visits and missed thirteen. (N.T. 9/13/16, pgs. 95-96, 107). Mother testified that she attended these thirteen visits, but that the CUA visitation coach did not show up. This testimony was not credible. (N.T. 9/13/16, pgs. 151-152). At the time of the trial, Mother had not seen the Children in a month. (N.T. 9/13/16, pg. 30, 94). Mother's behavior at visits is not appropriate. Mother spends most of her time at visits hold the baby, not interacting with the Children. (N.T. 9/13/16, pgs. 119-120). Child 1 does not want to interact with Mother during visits. (N.T. 9/13/16, pg. 116). Mother engages Child 2, who is seven, in age-inappropriate conversations, as though they were teenage girlfriends. (N.T. 9/13/16, pgs. 108, 117-118). Mother is not open to advice or redirection during visits, and is not able to provide for the Children at this time. (N.T. 9/13/16, pgs. 101-102). Mother sometimes brings food to visits, but refused to give it to the Children when they were hungry. She fed it to the baby instead. (N.T. 9/13/16, pg. 97). Mother refused to sign consents for Children's trauma therapy at JJPI and at Child 1's recent

hospitalization. Mother refuses to be involved in their therapy, forcing DHS to obtain court orders authorizing treatment. (N.T. 9/13/16, pgs. 24-25, 27-28, 196-198). The Children had been attending JJPI regularly while in Mother's care. It was only after their removal that attendance became an issue, since Mother refuses to consent to care. (N.T. 9/13/16, pg. 62). Mother's refusal to sign consents for the Children impaired their health and education. (N.T. 9/13/16, pgs. 47-48). Looking back beyond the six-month period, Mother has attended court hearings and is able to accurately recite her objectives. (N.T. 9/13/16, pg. 159, 191-192). During the six month period prior to the filing of the petitions, Mother has been performing fewer parental duties than at any other time in the life of this case. Mother has demonstrated that she cannot or will not perform parental duties. As a result the trial court did not abuse its discretion by finding clear and convincing evidence that Mother, by her conduct, had refused and failed to perform parental duties, so termination under this section was proper.

The trial court also terminated Mother's parental rights under 23 Pa.C.S.A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect or refusal of the parent that causes the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. *Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996).

Mother has demonstrated a pattern of noncompliance with her SCP objectives. Mother's SCP objectives were to obtain stable housing, attend CEU for dual diagnosis assessment, attend ARC for parenting classes, take a PCE and comply with the recommendations and visit with the Children. (N.T. 9/13/16, pg. 16). Mother was also ordered to attend medical appointment and sign consents for the Children. Mother does not have appropriate housing, and has lived at five different addresses since the Children came into care. At the start of this case in 2012, when the Children came into care a second time, Mother was offered housing at a shelter with the Children, but she refused and the Children had to be taken into DHS care. (N.T. 9/13/16, pgs. 16, 41). Mother currently lives in a house owned by a family member, but does not have a lease for that house. (N.T. 9/13/16, pg. 18). Mother lives with her baby, who is not in care. Mother has never

had appropriate housing for herself, the baby and the Children. (N.T. 9/13/16, pgs. 149-150). Mother testified that she worked two jobs, but was unable to save enough money for a deposit on an appropriate and stable house, and will not be able to obtain an appropriate house in the near future. (N.T. 9/13/16, pg. 172). Mother received three PHMC housing grants, each of which was over a thousand dollars. These grants are not intended to be given repeatedly, but are one-time payments to cover a deposit and first month's rent. (N.T. 9/13/16, pgs. 17, 41-42, 174-176, 177-179). Mother never attended CEU for dual diagnosis assessment, and is not engaged in drug and alcohol treatment. Mother testified that she had never had a mental health diagnosis, had never been on medication and had no history of mental illness. (N.T. 9/13/16, pg. 164). In the past, Mother has both admitted and denied mental health diagnoses and the use of prescription medications. (N.T. 9/13/16, pgs. 68, 85-87). CUA re-referred Mother for mental health evaluation and services on January 25, 2016, but never received any records showing that Mother was evaluated or began treatment. (N.T. 9/13/16, pg. 21). Mother testified that she did not do mental health intakes because they conflicted with her work schedule. (N.T. 9/13/16, pg. 180). Mother first engaged consistently in mental health treatment on June 14, 2016, and has not provided any documentation of her treatment. In the three months she has been engaged, Mother attended five sessions. (N.T. 9/13/16, pgs. 19, 157, 194-195). Mother has Major Depressive Disorder. (N.T. 9/13/16, pg. 193). The CUA case manager testified that Mother's mental health is still a concern, because Mother has mood swings and often curses at CUA employees. (N.T. 9/13/16, pgs. 43-44, 83-84). Mother completed two parenting classes at ARC, but the CUA case manager testified that Mother's behavior indicated that Mother would need to complete the class a third time. (N.T. 9/13/16, pgs. 22-23, 166-167). Mother was completely unable to explain anything she had learned at parenting classes, stating "I don't want to say I didn't learn anything." (N.T. 9/13/16, pgs. 183-184). Mother completed a PCE in 2013, which recommended that Mother engage in individual therapy. Mother did not engage until June 2016. The PCE stated that Mother was not ready to parent full-time. (N.T. 9/13/16, pg. 45-46). Because so much time had passed, Mother was referred for a second PCE in early 2016. This appointment was rescheduled several times and is currently scheduled for October 21, 2016. (N.T. 9/13/16, pgs. 27-28, 90). Mother originally had supervised visitation in her own home, but during one visit she had a verbal altercation with the foster parent. Visits were then moved to DHS. N.T. 9/13/16, pg. 106). Since the visits were moved, Mother has made six visits and missed thirteen. (N.T. 9/13/16, pgs. 95-96, 107). Mother

testified that she attended these thirteen visits, but that the CUA visitation coach did not show up. This testimony was not credible. (N.T. 9/13/16, pgs. 151-152). At the time of the trial, Mother had not seen the Children in a month. (N.T. 9/13/16, pg. 30, 94). Mother's behavior at visits is not appropriate. Mother spends most of her time at visits hold the baby, not interacting with the Children. (N.T. 9/13/16, pgs. 119-120). Child 1 does not want to interact with Mother during visits. (N.T. 9/13/16, pg. 116). Mother engages Child 2, who is seven, in age-inappropriate conversations, as though they were teenage girlfriends. (N.T. 9/13/16, pgs. 108, 117-118). Mother is not open to advice or redirection during visits, and is not able to provide safe parental care for the Children at this time. (N.T. 9/13/16, pgs. 101-102). Mother sometimes brings food to visits, but refused to give it to the Children when they were hungry. She fed it to the baby instead. (N.T. 9/13/16, pg. 97). Mother refused to sign consents for Children's trauma therapy at JJPI. Mother refuses to be involved in their therapy, forcing DHS to obtain court orders authorizing treatment. (N.T. 9/13/16, pgs. 24-25, 27-28, 196-198). The Children had been attending JJPI regularly while in Mother's care. It was only after their removal that attendance became an issue, since Mother would not sign consents. (N.T. 9/13/16, pg. 62). Mother's refusal to sign consents for the Children impaired their health and education. (N.T. 9/13/16, pgs. 47-48). Mother has attended court hearings and is able to accurately recite her objectives. (N.T. 9/13/16, pgs. 159, 191-192). Mother has failed to take affirmative steps to complete her objectives and place herself in a position to parent the Children. In fact, Mother's actions have made her *less* able to parent the Children. Mother has become less consistent in visiting the Children, and has even interfered with their treatment at JJPI by refusing to sign consents. Mother's conduct and failure to comply with court orders shows that Mother would be unable to remedy the causes of her incapacity in order to provide the Children with essential parental care, control or subsistence necessary for their physical and mental well-being. The Children need permanency, which Mother cannot provide. Termination under this section was also proper.

The trial court also terminated Mother's parental rights under 23 Pa.C.S.A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 938 A.2d 1128, 1133 (Pa. Super. 2009). The party seeking termination must also prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love comfort, security and stability. *In re Bowman*, A.2d 217 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

The Children in this case have been in DHS custody since February 27, 2012 – fifty-five months at the time of the trial. The Children were removed because Mother was unable to parent. Mother's main barriers to reunification are appropriate and stable housing, mental heath and parenting classes. Mother does not have appropriate housing, and has never had appropriate housing for herself, the Children and her baby. (N.T. 9/13/16, pgs. 18, 149-150, 172). Mother has received a number of PHMC housing assistance grants, but has consistently failed to maintain housing. (N.T. 9/13/16, pgs. 17, 41-42, 174-176, 177-179). She has even refused housing in a shelter, leading to the Children being taken into DHS care. (N.T. 9/13/16, pgs. 16, 41). Mother has never been assessed by CEU for drug and alcohol issues, despite court orders. Mother has denied having mental health issues. (N.T. 9/13/16, pg. 164). Mother admitted her mental health diagnoses and prescription medications to CUA. (N.T. 9/13/16, pgs. 68, 85-87). Mother has Major Depressive Disorder. (N.T. 9/13/16, pg. 193). CUA re-referred Mother for mental health evaluation and services on January 25, 2016, but Mother did not attend the evaluation, because it conflicted with her work. (N.T. 9/13/16, pgs. 21, 180). Mother first engaged consistently in mental health treatment on June 14, 2016, and has not provided any documentation of her treatment. In the three months she has been engaged, Mother attended five sessions. (N.T. 9/13/16, pgs. 19, 157, 194-195). The CUA case manager testified that Mother's mental health is still a concern, because Mother has mood swings and often curses at CUA employees. (N.T. 9/13/16, pgs. 43-44, 83-84). Mother completed two parenting classes at ARC, but the CUA case manager testified that Mother's behavior indicated that Mother would need to complete the class a third time. (N.T. 9/13/16, pgs. 22-23, 166-167). Mother was completely unable to explain anything she had learned at parenting classes, stating "I don't want to say I didn't learn anything." (N.T. 9/13/16, pgs. 183-

184). Mother attends court hearings and knows her objectives. (N.T. 9/13/16, pgs. 159, 191-192). As of the time of the trial, Mother had not remedied the conditions which brought the Children into care, and was not ready to parent safely. (N.T. 9/13/16, pgs. 22-23, 27-28, 101-102). The Children are placed in pre-adoptive homes, with foster parents who provide for their needs. (N.T. 9/13/16, pgs. 29, 50). The Children do not want to visit with Mother, and throw tantrums. (N.T. 9/13/16, pgs. 80-81, 98-99). Child 1 does not consider Mother to be his mother. (N.T. 9/13/16, pg. 49). Mother has missed thirteen of the last twenty-two visits. (N.T. 9/13/16, pgs. 95-96, 107). During visits, Mother mostly interacts with her baby, not the Children. (N.T. 9/13/16, pgs. 119-120). The Children do not have healthy, age-appropriate relationships with Mother. (N.T. 9/13/16, pgs. 108, 116, 117-118). Termination of Mother's parental rights is in the best interest of the Children. (N.T. 9/13/16, pgs. 29, 47-48, 50, 101-102). DHS's witnesses were credible. Mother is not ready, willing or able as of today to parent the Children full-time. The record contains clear and convincing evidence that the trial court did not abuse its discretion and termination under this section was also proper.

After a finding of any grounds for termination under Section (a), the court must, under 23 Pa.C.S.A. §2511(b), also consider what - if any - bond exists between parent and child. _In re Involuntary Termination of C.W.S.M. and K.A.L.M._, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship". _In re Adoption of T.B.B._ 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. _In re K.Z.S._, 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. _In re K.Z.S._ at 762-763. However under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

Mother's visits with the Children have never been consistent. She has missed thirteen of the last twenty-two visits. (N.T. 9/13/16, pgs. 95-96, 107). Mother never asks CUA about the Children. (N.T. 9/13/16, pgs. 22-23). During visits, Mother mostly interacts with her baby, not the Children.

(N.T. 9/13/16, pgs. 119-120). Mother fed only the baby with food she had brought to a visit, allowing the Children to remain hungry. (N.T. 9/13/16, pg. 97). The Children do not have healthy, age-appropriate relationships with Mother. Mother does not have a positive, beneficial relationship with the Children. (N.T. 9/13/16, pgs. 108, 116, 117-118). The Children do not want to visit with Mother, and throw tantrums. Child 1 must be physically carried, kicking and screaming, to the visits. (N.T. 9/13/16, pgs. 80-81, 98-99). Child 1 does not consider Mother to be his mother. (N.T. 9/13/16, pg. 49). They would suffer no irreparable harm if Mother's rights were terminated. (N.T. 9/13/16, pgs. 47-48). Mother called to former CUA supervisor as her witness to indicate that during the time between December 11, 2015, and March 30, 2016, the Children would have suffered irreparable harm if Mother's right were terminated. However, the trial court found Mother's witness not credible since the witness never observed any visits between Mother and the Children, and never spoke to the Children. (N.T. 9/13/16, pgs. 139-145). The Children are placed in pre-adoptive homes, with foster parents who provide for their needs. (N.T. 9/13/16, pgs. 29, 50). Termination of Mother's parental rights is in the best interest of the Children. (N.T. 9/13/16, pgs. 29, 47-48, 50, 101-102). Consequently, the court did not abuse its discretion when it found that it was clearly and convincingly established that there was no parental bond with Mother, and that termination of Mother's parental rights would not destroy an existing beneficial relationship.

**Conclusion:**

For the aforementioned reasons, the trial court found that DHS met its statutory burden by clear and convincing evidence regarding termination of Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (8) and (b) since it would best serve the Children's emotional needs and welfare. The trial court's termination of Mother's parental rights was proper and should be affirmed.

By the court,

Joseph Fernandes J.

# IN THE COURT OF COMMON PLEAS
# FOR THE COUNTY OF PHILADELPHIA
# FAMILY COURT DIVISION

In the Interest of Z.T.-D.N., a Minor     :     CP-51-DP-0012032-2010
                                     :     CP-51-AP-0000186-2014

In the Interest of Z.N.N., a Minor      :     CP-51-DP-0012031-2010
                                     :     CP-51-AP-0000187-2014

                                     :     FID: 51-FN-471113-2009

APPEAL OF: C.N., Mother          :     3108/3109 EDA 2016

## PROOF OF SERVICE

I hereby certify that this court is serving, today, November 10, 2016, the foregoing Opinion, by regular mail, upon the following persons:

Barbara Ash, Esq.
City of Philadelphia Law Dept.
1515 Arch Street, 16th Floor
Philadelphia, PA 19102
Counsel for DHS

Patricia A. Cochran, Esq.
1800 Jfk Blvd Ste 300
Philadelphia, PA 19103
Counsel for Father

Aaron A. Mixon, Esq.
Address: Mixon, Charles-Asar, & Assoc., LLC
100 S. Broad Street
Suite 1518
Counsel for Mother

Lindsey Renae Alexander, Esq.
Support Center for Child Advocates
1900 Cherry St
Philadelphia, PA 19103-1405
Child Advocate

By: _____
Turner N. Falk
Law Clerk to the Hon. Joseph L. Fernandes
Philadelphia Court of Common Pleas, Family Division
1501 Arch St, Room 1431
Philadelphia, Pa. 19102 T: (215) 686-2660